**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-1163-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-1164-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-1165-ADA** |
| *Plaintiff,* | § | **CIVIL ACTION 6:20-cv-1166-ADA** |
| | § | **CIVIL ACTION 6:20-cv-1167-ADA** |
| **v.** | § | **CIVIL ACTION 6:20-cv-1168-ADA** |
| | § | **CIVIL ACTION 6:20-cv-1169-ADA** |
| **SALESFORCE.COM, INC.,** | § | **CIVIL ACTION 6:20-cv-1170-ADA** |
| *Defendant.* | § | **CIVIL ACTION 6:20-cv-1171-ADA** |
| | § | **CIVIL ACTION 6:20-cv-1172-ADA** |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

**Table of Contents**

I.  **U.S. Patent No. 7,551,731 (Case No. 6:20-cv-1163-ADA)** ............................................ **1**

1.  "calling terminal" (claims 1, 2, 7-11, 16-17) ........................................................1

2.  "looking up, based on at least one of a hour, minute, second and day" (claims 1, 10) ...................................................................................................................4

3.  "changeable by at least one of the calling terminal and a network" (claims 1, 10, 16). .............................................................................................................6

4.  "called terminal" (claims 10, 11) .......................................................................7

II. **U.S. Patent No. 8,209,411 (Case No. 6:20-cv-1164-ADA)** .......................................... **8**

1.  "messaging gateway" (claims 1, 10, 18) .............................................................8

III. **U.S. Patent No. 8,280,928 (Case No. 6:20-cv-1165-ADA)** ....................................... **11**

1.  "directory" (claims 1, 13) ...................................................................................11

2.  "identifying a single initial descriptor that links a plurality of descriptors and two or more predecessor descriptors linking another single descriptor" (claims 1, 13) ..............................................................................................................13

IV. **U.S. Patent No. 8,335,819 (Case No. 6:20-cv-1166-ADA)** ...................................... **15**

1.  "scripting file" (claims 1–2, 5, 7–9, 12, 14, 16–17) ..........................................15

2.  "first-time request" (claims 1, 8, 16) ...............................................................16

V.  **U.S. Patent No. 8,369,827 (Case No. 6:20-cv-1167-ADA)** ...................................... **18**

1.  "Subscriber Profile Repository (SPR)" (claims 1, 14) .......................................18

VI. **U.S. Patent No. 8,391,892 (Case No. 6:20-cv-1168-ADA)** ...................................... **21**

1.  Single dispute: whether claim 1 recites a specific order of steps ....................21

VII.**U.S. Patent No. 8,923,899 (Case No. 6:20-cv-1169-ADA)** ...................................... **23**

1.  "RESTful" (claims 1, 3, 6-8, 10, 13-16) ...........................................................23

2.  "Session Initiation Protocol (SIP) request" / "SIP request" (claims 1-2, 6-9, 13-16) .....................................................................................................................25

**VIII.    U.S. Patent No. 9,088,493 (Case No. 6:20-cv-1170-ADA)** ........................................ **26**

    1.   "login of the user with one of the one or more online services" (claims 1,5)..................26

    2.   "[determining / determine] … a pattern of consistent usage from the timing information" (claims 1,5)...........................................................................................28

    3.   "a consistency of the determined pattern of consistent usage" (claims 1,5).................28

**IX.   U.S. Patent No. 9,277,060 (Case No. 6:20-cv-1171-ADA)**.................................................. **30**

    1.   "event" (claims 1, 5, 8, 9, 11, 17, 18, 21)...............................................................30

    2.   "log(s)" (claims 1, 2, 3, 11, 17, 21) .......................................................................32

**X.    U.S. Patent No. 9,336,320 (Case No. 6:20-cv-1172-ADA)**................................................... **33**

    1.   "the menu items are associated with the two or more different services" (claims 1,10) ..................................................................................................................33

    2.   "presented in a manner indicating that the at least one menu item is unavailable" (claims 1, 10) .............................................................................37

**Exhibits**

| Exhibit | Description |
| --- | --- |
| A | U.S. Pat. No. 6,343,120 ("Rhodes") |
| B | Alastair Campbell, The Digital Designer's Jargon Buster (2004) (excerpts) |
| C | Office Action, U.S. Appl. No. 13/160,658 |

Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development ("WSOU") submits the following Responsive Claim Construction Brief pursuant to the Order Governing Proceedings 3.5 ("OGP") and the Scheduling Order entered in this case.[1]

## I.      U.S. Patent No. 7,551,731 (Case No. 6:20-cv-1163-ADA)

### 1.   "calling terminal" (claims 1, 2, 7-11, 16-17)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "a device that originates a call" |

The term "calling terminal" requires no construction for the following reasons.

***First***, Salesforce errs in attempting to rewrite "terminal" as "a device" in this context. Nothing in either the '731 patent itself or its prosecution history compels the erroneous rewrite Salesforce proposes. While the term "calling ***terminal***" appears throughout the '731 patent in various contexts, the word "device" is not used to describing the "calling terminal."[2] Instead, the "calling terminal" is consistently described only with respect to other types of terminals. '731 patent at 4:7-8 ("calling terminal may be one of a mobile terminal and a non-mobile terminal"); 4:54-57 ("calling terminal may be one of a mobile terminal and a non-mobile terminal …."). The word "device" is not recited in any of the claims, and only is mentioned in the specification with respect to (a) the prior art "automatic number identification device is used in a telephone system" and (b) "memory device such as a random access memory (RAM)." *Id.* at 1:44-45; 1:59. Tellingly, Salesforce fails to cite any support that would define the actual term in dispute ("calling terminal") or otherwise equate "terminal" with "device." *See* Br. 30-32.  Instead, Salesforce resorts to extrinsic dictionary definitions for other terms that include "call" or a form of that word used as an adjective to modify other nouns (*i.e.*, "called party," "calling party," "caller ID (CLID)," "calling device," "calling party identification," and "caller name"). And to the extent Salesforce

---

[1] In this Responsive Brief, WSOU has adhered to the Court's default order of terms for claim construction briefing. *See* OGP at 4. Salesforce did not obtain WSOU's agreement to deviate from the default order, and it fails to provide any justification in its Opening Brief to do so.

[2] Emphasis is added unless otherwise noted.

maintains by interjecting the word "device" that a "terminal" must necessarily be embodied in hardware (as opposed to software or program), Salesforce has not provided any principled reason to restrict the term in that manner. Indeed, while WSOU rejects Salesforces' reliance on extrinsic evidence, Salesforce's own extrinsic evidence demonstrates that limiting these terms to mere "device[s]" is too narrow. *See* Br. 30-31 (citing dictionary definition of "calling party" that refer to "equipment*, or program*"). Finally, Salesforce also lacks any support to impose its arbitrary restriction that the "calling terminal" must constitute "a" single device (as opposed to one or more devices that may collectively constitute a terminal).

*Second*, Salesforce's proposal to define a "calling terminal" as "originat[ing] a call" is unnecessary in view of the surrounding claim language provides context. For instance, claim 1 recites the step of "***entering a command to use*** at least one of an alternate caller name, an alternate caller number and an alternate caller message ***for a calling terminal***, instead of a preassigned caller name and caller number for the calling terminal" and also the step of "***using*** the at least one of an alternate caller name, an alternate caller number and an alternate caller message in place of the preassigned caller name and caller number ***for the calling terminal***." *Id.* at 5:41-44; 5:52-55. There is no requirement in the claims that a call "originate" as Salesforce would impose.

*Third*, Salesforce attempts to bootstrap its proposed construction by fashioning a false dichotomy between "calling terminal" and "called terminal" proclaiming unilaterally that both are "explicitly differentiat[ed]." *See* Br. 31. But the only intrinsic evidence Salesforce cites to support its position is the separate recitation of both terms in the claims and the specification. *Id.* (citing claim 10, 11, 13, 18, and 19; 2:1-6; 3:42-47). But merely because two different terms are used in a claim or specification does not necessarily "explicitly differentiate" them as Salesforce claims. To do so would make *any* two different claims terms "explicitly differentiat[ed]" under Salesforce logic. This would eviscerate the rule that there are only "two exceptions to [the] general rule" to adopt plain and ordinary meaning—lexicography or disavowal. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Salesforce cannot unilaterally claim a third exception to the general rule merely by unilaterally claiming a "differentiat[ion]." *See* Br.

33.[3] Rather than differentiate, the specification describes both "calling terminal" and "called terminal" similarly. '731 patent at 4:54-57 ("The calling terminal may be one of a mobile terminal and a non-mobile terminal, and the called terminal may be one of a mobile terminal and a nonmobile terminal.").

**Fourth**, in the context of other patents, courts have construed the claim term that included the phrase "calling terminal" to have its plain meaning. *Mobile Telecommunications Techs., LLC v. Google Inc.*, 2:16-CV-2-JRG-RSP, 2016 WL 7338398, at *43 (E.D. Tex. Dec. 19, 2016). And the phrase "calling terminal" is so readily understood in the art that district courts have incorporated both terms in the constructions of disputed claim terms. *E.g., Verizon Services Corp. v. Cox Fibernet Virginia, Inc.*, CIV.A. 08-0157, 2008 WL 5169451, at *5 (E.D. Va. Sept. 3, 2008) (construing a term with a definition that includes the phrase "between a **calling** and called **terminal**").[4] Thus, courts have either let the plain and ordinary meaning stand for "calling terminal" or included the phrase "calling … terminal" in the actual constructions (thus further demonstrating that "calling termina" has a plain meaning).

---

[3] Salesforce's reliance on *Eon* is inapposite. *See* Br. at 34 (citing *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1321 (Fed. Cir. 2016)). In *Eon*, the Federal Circuit particularly noted that the specification "provide[d] **extensive** guidance about the terms" at issue ("portable" and "mobile"). Here, in contrast, Salesforce fails to identify any such extensive guidance, and merely cites to different portions of the specification where "called terminal" and "calling terminal" are discussed in passing. As noted previously, both terms are merely described in the specification in an open-ended fashion. '731 patent at 4:7-8 ("calling terminal may be one of a mobile terminal and a non-mobile terminal"); 4:54-57 ("The calling terminal may be one of a mobile terminal and a non-mobile terminal, and the called terminal may be one of a mobile terminal and a nonmobile terminal.").

[4] WSOU disputes that the District of Delaware's construction of "called party" and "calling party" (two terms that are different than construed here) for a different patent have any bearing on the construction of "called terminal" and "calling terminal."  See Br. 31 n.8. (citing *Intell. Ventures I LLC v. Check Point Software Techs Ltd.*, No. CIV.A. 10-1067-KPS, 2012 WL 6200337, at &11 (D. Del. Dec. 12, 2012). Salesforce fails to acknowledge that other district courts (including the Eastern District of Texas) adopted plain and ordinary meaning for a claim term that recited both "called party" and "calling party." *Estech Sys., Inc. v. Burnco Tex. LLC*, 220CV00275JRGRSP, 2021 WL 2530959, at *10 (E.D. Tex. June 18, 2021); *accord Metaswitch Networks Ltd. v. Genband USA LLC*, 2:14-CV-744-JRG-RSP, 2015 WL 11197822, at *12 (E.D. Tex. Aug. 10, 2015) (adopting plain meaning for term that included "called party").

### 2. "looking up, based on at least one of a hour, minute, second and day" (claims 1, 10)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "looking up based on a particular point in time defined by at least an hour, minute, second, or day (as opposed to an appropriate time)" |

Salesforce grossly misreads the prosecution history to fabricate a prosecution disavowal case where no such disavowal occurred. Because Salesforce inaccurately summarizes the prosecution history, a more fulsome discussion is set forth below to provide a proper understanding of the record.

During prosecution, the Examiner rejected pending claims based on U.S. Pat. No. 6,343,120 ("Rhodes"), which the Examiner characterized as follows:

> Rhodes teaches looking up, based on at least one of a time and day, the at least one of an alternate caller name, an alternate caller number and an alternate caller message, the at least one of an alternate caller name, an alternate caller number and alternate caller message being changeable by ay least one calling terminal and a network [calling parties will be provided with flexibility in identifying themselves or selecting from among different identifications or messages to be transmitted to a party for whom calling party identification number is displayed. This will allow calling parties to customize their identifications to meet needs as they arise for different callers at different times, column 5, line 31 to column 6, line 8].

Ex. 731-5 (Final Office Action) at 5-6.[5]

The portion of Rhodes cited by the Examiner (5:31-6:8) is set forth fully below:

> In an alternative configuration illustrated in FIG. 4B, separate databases are provided for the various identification information that is associated with a given calling party number. For instance, in database 410, only public names are associated with calling numbers. A second database 420 lists the same calling numbers but with alias information for each calling number. Thus, the privacy status indicator that is included in the query from the terminating LEC would then be used to select the appropriate database for accessing identification information. Once the database is selected, the calling party number would then be used to identify the identification information to be transmitted to the terminating LEC.

---

[5] When referring to Salesforce's Exhibits, WSOU refers to the page number in the ECF header.

> In accordance with the present invention, calling parties will be provided with flexibility in identifying themselves or selecting from among different identifications or messages to be transmitted to a party for whom calling party identification number is displayed. This will allow calling parties to customize their identifications to meet needs as they arise for different callers *at different times.*

Ex. A at 5:31-6:8.

In the Response to the Office Action, the Applicants first quoted the second paragraph above of Rhodes (with the exception of the phrase "[i]n accordance with the present invention"), and then noted:

> In the previously cited text, ***"times" refers to proper or appropriate times*** to display calling line identifications. The word "times" does not refer to displaying at least one of an alternate caller name, and alternate caller number and an alternate caller message based on a time and day. The word "time., has a different meaning when used in the selected Rhodes quote as opposed to the use of the phrase •'time and day" found in independent claims 1 and 10 of the instant application. "Time and day" refers to a particular point in time, not to an appropriate time.
>
> * * *
>
> Thus **claimed invention discloses looking up, based on at least one of a time and day,** the at least one of an alternate caller name, an alternate caller number and an alternate caller message. ***The cited prior art, however, discloses looking up calling party identification based on an appropriate time, not a particular point in time.*** Neither *Rhodes* or any of the other prior art cited by the Examiner discloses, teaches or suggests looking up, based on at least one of a time and day. the at least one of an alternate caller name, an alternate caller number and an alternate caller message.

Ex. 731-6 (Response to Office Action) at 11-12.

Thus, the Applicants were merely pointing out that Rhodes uses the words "times" in the subjective sense of appropriate times, whereas the claimed invention refers to a quantifiable, objective language "time and day," which is a "particular point in time." Salesforce wrongly attempts to create a false distinction between "particular point in time" and "appropriate time." *See* Br. 33-34.

***First***, the Applicants were merely noting the deficiencies of Rhodes—that the reference to "time" in Rhodes was referring to "appropriate times," which could also be described as instances or occurrences.  There is no teaching of Rhodes of a particular point in time.

***Second***, Salesforce is wrong to draw a distinction between "particular point in time" and "appropriate time."  A particular point in time may in fact be appropriate or inappropriate. There is no indication that the Applicants were disavowing particular points in time that happened to be appropriate as well. The Applicants statements were directed to the lack of disclosure in Rhodes and did not categorically disavow subject matter. The Applicants did not disavow categorically "appropriate times," but merely noted how the disclosure in Rhodes was lacking. *See St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*, CIV.A.03-241 JJF, 2004 WL 1941340, at *17 (D. Del. Aug. 31, 2004) (finding no disavowal of "all memory cards" despite applicants distinguishing prior art); *DataTreasury Corp. v. Ingenico S.A.*, 5:02CV124, 2006 WL 6222493, at *3 (E.D. Tex. Apr. 14, 2006) (no disavowal of ordinary meaning of "remote" despite distinguishing prior art), report and recommendation adopted, 5:02CV124, 2006 WL 6112211 (E.D. Tex. Oct. 6, 2006).

### 3. "changeable by at least one of the calling terminal and a network" (claims 1, 10, 16).

| WSOU's Position | Salesforces' Position |
| --- | --- |
| Plain-and-ordinary meaning | "changeable by a device that originates a call or a network supporting that device" |

Salesforce's construction of this term should be rejected for the following reasons.

***First***, Salesforce reiterates its arguments with respect to "calling terminal," and then replaces that term with its proposed definition of the term. Br. 32. WSOU defers to its above arguments for "calling terminal," and in any event, there is no need to separately construe this broader phrase merely because it includes the shorter phrase "calling terminal."

***Second***, Salesforce fails to provide ***any*** explanation (principled or otherwise) why it (i) interjects the phrase "supporting that device" into its construction and (ii) removes the phrase "at

least one of" from the claim language.  *See* Br. at 33-33. The Court should not deviate from the claim language especially where Salesforce has failed to provide ***any*** reason to do so. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

### 4.   "called terminal" (claims 10, 11)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "a device to which a call is directed" |

The term "called terminal" requires no construction for the following reasons and which are analogous to those recited for "calling terminal" in Section I.A.1, *supra*.

***First***, as with "calling terminal," Salesforce errs in attempting to rewrite "terminal" as "device" in this context. Nothing in either the '731 patent itself or its prosecution history compels the erroneous rewrite Salesforce proposes. While the term "called ***terminal***" appears throughout the '731 patent in various contexts, the word "device" is not used to describing the "called terminal." Instead, the "called terminal" is only described with respect to other types of terminals. '731 patent at 4:54-57 ("called terminal may be one of a mobile terminal and a nonmobile terminal"). The word "device" is not recited in any of the claims and is only mentioned in the specification with respect to (a) the prior art "automatic number identification device is used in a telephone system" and (b) "memory device such as a random access memory (RAM)." *Id.* at 1:44-45; 1:59. To the extent Salesforce maintains by interjecting the word "device" that a "terminal" must necessarily be embodied in hardware (as opposed to software or program), Salesforce has not provided any principled reason to restrict the term in that manner. Indeed, while WSOU rejects Salesforces' reliance on extrinsic evidence, Salesforce's own extrinsic evidence demonstrates that limiting this term to a mere "device" is too narrow. *See* Br. 30-31 (citing dictionary definition of "called party" that refer to "equipment***, or program***"). Finally, Salesforce also lacks any support

to impose its arbitrary restriction that the "called terminal" must constitute "a" single device (as opposed to one or more devices that may collectively constitute a terminal).

**Second**, Salesforce's proposal to define a "called terminal" as "a device to which a call is directed" is unnecessary in view of the surrounding claim language that provides context. For instance, claim 10 recites as context in the preamble "method for network support for providing caller flexibility information of a calling terminal that is **_displayed on a called terminal_**." '731 patent at 6:25-27. Claim 10 then recites the step of "**_displaying on the called terminal_** the at least one of an alternate caller name, an alternate caller number and an alternate caller message in place of the preassigned caller name and caller number for the calling terminal." *Id.* at 6:43-46. There is no requirement in the claims that a "called terminal" be one in "which a call is directed" as Salesforce proposes.

**Third**, Salesforce attempts to bootstrap its proposed construction by fashioning a false dichotomy between "calling terminal" and "called terminal," proclaiming unilaterally that both are "explicitly differentiat[ed]." *See* Br. 31. The same arguments made with respect to "calling terminal" apply, and WSOU incorporates by reference its Third argument in Section I.A.1, *supra*.

**Fourth**, similar to the phrase "calling terminal" as noted above, the phrase "called terminal" is so readily understood in the art that district courts have incorporated both terms in the constructions of disputed claim terms. *E.g., Verizon*, CIV.A. 08-0157, 2008 WL 5169451, at *5 (construing a term with a definition that includes the phrase "**_called terminal_**"). Thus, courts have included the phrase "called terminal" in the actual constructions (thus further demonstrating that "calling termina" has a plain meaning).

## II.     U.S. Patent No. 8,209,411 (Case No. 6:20-cv-1164-ADA)

### 1.   "messaging gateway" (claims 1, 10, 18)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "a device or program to connect disparate computer network environments and deliver content from the first network environment to a specific apparatus in the second network environment" |

Salesforce's proposed construction should be rejected for the following reasons.

*First*, while Salesforce concedes that a plain and ordinary meaning exists for the term "gateway," it attempts to interject a non-technical dictionary definition. In particular, Salesforce relies on the "The Digital Designer's Jargon Buster," ("Jargon Buster") which is described as an "up-to-date guide to the digital ***designer's*** lexicon" with "contributors include[ing] professional photographers, 3D designers, video editors, graphic designers, typographers, and more." *See* Ex. B at Introduction; *see also id.* at Back Cover ("[w]hether you're a designer, or working in a related field such as print, production, publishing or editing, this comprehensive dictionary of design terms is for you"). This is further confirmed in that Jargon Buster author has a non-technical background. Ex. B at About the Author (listing the author as a cofounder of a "design group" and lecturing on design, typography and illustration). Salesforce also fails to explain why it selectively relies on the non-technical Jargon Buster dictionary definition while at the same time ignoring a portion of definition recited in the Microsoft Computer Dictionary on which it also relied. Ex. 411-3 at 232 (not explaining why it did not cite the portion of the definition of "gateway" as "[a] device that connects networks using different communications protocols so that information can be passed from one to the other"). Salesforce seems enamored with the non-technical Jargon Buster definition because, in contrast to the Microsoft Computer Dictionary, it refers to "disparate."

*Second*, improperly relying on the Jargon Buster definition as a bootstrap, Salesforce claims that the claim language "identifies the two disparate networks that the claimed messaging gateway interfaces between" and cites the following language from claim 1:

> interfacing, via a messaging gateway, a first network environment and a second network environment to receive, from the first network environment

Ex. 411-1 at 19:65-20-1. Salesforce applies circular reasoning to claim that "[b]ecause the claim language separately calls out these two elements, a POSITA would understand that his necessarily refers to two separate networks." Br. 23. But Salesforce fails to cite to any intrinsic evidence that indicates that the networks are "necessarily … separate" and certainly not any lexicography or disclaimer that is required for the two *Thorner* exceptions.

**Third**, Salesforce misreads and misapplies the specification relies on the specification to improperly limit the claims. For instance, Salesforce quotes the following excerpt from the Summary of the Invention that—according to Salesforce—purportedly shows that the "messaging gateway connects two different networks:

> In light of the foregoing background, **embodiments** of the present invention provide an improved system, method and computer program product for providing content from a fixed network, typically, personal computer (PC), environment to a destination, such as a mobile terminal, operating in a different network and computing platform.

Ex. 411-1 at 2:47-52. Notably, the description is limited merely to "embodiments." And there is no discussion (let alone lexicography or disavowal of the term at issue—"messaging gateway"). *See id.* Even when Salesforce relies on portions of the specification that discuss "messaging gateway," those portions do not limit that term as Salesforce proposes.  For instance, Salesforce relies on the following:

> Thus, **in accordance with embodiments** of the present invention, a source (e.g., personal computer) **capable of** operating in a fixed network environment (e.g., LAN, MAN, WAN, etc.) is **capable of** reformatting content into a scalable digital printout by means of a printing interface at the source before being provided to a destination (e.g., terminal) capable of operating in a cellular network environment (e.g., TDMA, GSM, CDMA, GPRS, EDGE, MBMS, DVB, CSD, HSCSD, etc.). The digital printout can then be provided to the destination based upon an address of the destination and through a messaging gateway 25, which is **capable of** interfacing between the fixed network environment and the cellular network environment.

*Id.* at 9:45-57. This portion of the specification merely describes what the "messaging gateway" is "capable of" in certain "embodiments."  The passage does not limit the invention as claimed.

**Fourth**, Salesforce claims that the Applicants disavowed claim scope. Br. 24-25 (quoting but not citing a portion of the specification (1:55-2:4)). But the portion of the specification that Salesforce quotes does not even reference the term at issue—"messaging gateway." *See id.* Because "messaging gateway" is not even mentioned, Salesforce has not explained how its relied-upon portions of the specification would create a "clear and unequivocal disavowal" of the concepts of "pointing" and "dragging" described in the specification. The "standard for disavowal"

is "*exacting*" and requiring that the specification "makes clear that the invention does not include a *particular feature*." *Thorner*, 669 F.3d at 1366 (quotations omitted). Here, Salesforce fails to meet this "exacting" standard when it fails to identify any portion of the specification that even refers to "messaging gateway."

**III.   U.S. Patent No. 8,280,928 (Case No. 6:20-cv-1165-ADA)**

**1.   "directory" (claims 1, 13)**

| WSOU's Position | Salesforce's Position |
|---|---|
| The preambles of claims 1 and 13 do not recite "directory" as a limitation. | "An entity in a file system which contains a group of files and/or other directories" |

The word "directory" recited in the preambles of claims 1 and 13 is presumptively not limiting.[6]   Salesforce fails to rebut the presumption.   As recited in claims 1 and 13, the word "directory" appears only within a list of compound modifiers in the claim preambles as follows: "*multi-level hierarchical directory* structure."   Neither claim has been shown to affirmatively require a "directory" *itself*, in its entirety, much less one per Salesforce's circular definition.

The presumption here is supported by the fact that the bodies of claims 1 and 13 do not use the definite article "the" to make antecedent reference to anything in the preamble.   Nevertheless, Salesforce adds falsehood to falsehood in pointing to "hierarchical structure linking the different levels of descriptor" as a limitation that (1) allegedly derives antecedent basis from the preamble (it does not) and (2) is recited in both claims 1 and 13 (it is recited in the body of claim 1 only). Br. 11. Salesforce's partial quotation omits the indefinite article "a" used to *independently* introduce the element "***a*** hierarchical structure …."   *Id*.   Moreover, the body of claim 1 is distinguished from its preamble at least in that the body does not recite the word "directory" as a modifier for the element "***a*** hierarchical structure …."

---

[6] *Ancora Techs., Inc. v. LG Elecs. Inc.*, Case No. 1-20-CV-00034-ADA, 2020 WL 4825716, at *6 (W.D. Tex. Aug. 19, 2020) ("Courts presume that the preamble does not limit the claims.") (citing *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010)); *see also Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) ("Generally, the preamble does not limit the claims.") (citations omitted).

Thus, the word "directory" does _not_ provide antecedent basis in claim 1 because the body of claims 1 lacks the same "directory" modifier _and_ the body of claim 1 introduces its elements independent of the preamble.  Even so, if the element introduced in the body of claim 1 as "_**a**_ hierarchical structure …" (recited without a "directory" modifier) is interpreted to be the same as the "… directory structure" appearing in the preamble, this too would only support the presumption that the preamble is not limiting.  _See Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC_, 962 F.3d 1362, 1367–68 (Fed. Cir. 2020) ("The preamble … cannot be said to provide essential structure or necessary meaning to the claimed invention because the same element … is independently recited in the body of the claim.").

For independent claim 13, Salesforce argues the preamble word "directory" is limiting ostensibly because it provides antecedent basis for the term "enmeshed directory." Br. 11.  While Salesforce identifies both claims 5 and 13 as allegedly reciting the "enmeshed directory" term (_id._), that term does _not_ appear in the body of claim 13.  Salesforce fails to explain why its argument of antecedent basis applies to _either independent claim 1 or 13_, where neither claim recites "enmeshed directory" in its body.  While the couplet "enmeshed directory" appears in certain dependent claims, Salesforce also opted to not offer any opinion as to whether a preamble word could be construed as limiting a _dependent_ claim but not limiting the _independent_ claim in which the preamble word appears. WSOU does not address these extraneous issues because (1) Salesforce opted to not raise (and thus waived) argument on such issues, (2) Salesforce only purports to seek construction of the "directory" word recited in the preambles of claims 1 and 13 (Br. 11), and (3) claims 1 and 13 both refute, on their face, the false underlying premise that the couplet "enmeshed directory" is recited in the body of either independent claim.

Compounding its error, Salesforce seeks to import from the specification what Salesforce alleges is lexicography directed to "directory" _itself_.  Br. 11 (quoting Ex. 928-1, 1:25–27).  Even if the word "directory" appearing in the preambles of claims 1 and 13 is properly deemed limiting (and it is not), neither preamble refers to "a directory"—_in its entirety_—as a distinct element.  Rather, "directory" appears in the preambles within a compound list of _adjectival modifiers_—i.e.,

"*multi-level hierarchical directory* structure."  The alleged definition Salesforce seeks to import from the specification does not purport to define a "multi-level hierarchical directory *structure*," where "directory" is used as an adjectival modifier in the same context.  Salesforce's improper importation should also be rejected as (1) being circular in its use of "directories" (in the plural form) to define "directory" and as (2) needlessly adding an "entity" term that is not itself defined.

### 2.  "identifying a single initial descriptor that links a plurality of descriptors and two or more predecessor descriptors linking another single descriptor" (claims 1, 13)

| WSOU's Position | Salesforce's Position |
|---|---|
| Plain-and-ordinary meaning. | "identifying a single initial descriptor in a first level of the hierarchy, the single initial descriptor linked to a plurality of descriptors in a second level of the hierarchy, the plurality of descriptors linked to two or more predecessor descriptors in a third level of the hierarchy, and the two or more predecessor descriptors linked to another single initial descriptor that is in a fourth level of the hierarchy" |

The disputed "identifying …" phrase is self-explanatory, recites straightforward terms, and requires no construction apart from plain-and-ordinary meaning.  Salesforce offers a fundamental and incorrect rewrite of the disputed phrase that does not purport to *define* any of its terms.  Rather, Salesforce's erroneous construction copies most (though not all) of the original terms, and then fundamentally alters the plain meaning, including by adding extraneous requirements directed to *unrecited* levels.  Salesforce misinterprets the prosecution history and the claim language itself in arguing its construction is compelled by statements "in which [the] applicant expressly characterized this claim limitation" during prosecution.  Br. 13.[7]

Contrary to what Salesforce suggests, the appeal brief filed by the applicant during prosecution did not purport to rewrite or define any aspect of the claim language in question.  *Cf.* Br. 13 (partially quoting 928-6 at 13).  On the contrary, the cited remarks simply repeated the claim language *verbatim*, alongside parentheticals which pointed to example relevant descriptions in the specification.  The actual statement is reproduced below (i.e., without Salesforce's alterations).

---

[7]  Salesforce does expressly characterize any statement in the prosecution history as allegedly satisfying the exacting standard for *disclaimer*.

> As claimed, there are at least four levels to the hierarchy; namely, (1) an ***initial descriptor*** (e.g., 310-1 through 310-12) ***that*** (2) ***links a plurality of descriptors*** (e.g., AS, A6, A7, A8, B4, BS, B6 and B7) ***and*** (3) ***two or more predecessor descriptors*** (e.g., A2, A3, A9, B2 and B3) ***linking*** (4) ***another single descriptor*** (e.g., Al, A4, Bl).

928-6 at 13 (italics and boldface added to emphasize the claim language). The introductory expression "as claimed" reveals the applicant's position that the claim language *as issued* is self-explanatory under its plain-and-ordinary meaning. *Id.* Moreover, not one of the several revisions Salesforce pulls from thin air is expressed in the quoted statement from the prosecution.

Salesforce's proposed rewrite should also be rejected as fundamentally departing from what is expressly recited. According to Salesforce's construction, "the single initial descriptor" must be "in a first level of the hierarchy" and "linked to a plurality of descriptors in a second level of the hierarchy." Neither the claim language nor the cited statement from prosecution qualifies the "initial descriptor" in terms of it necessarily being *located* "in" a specific hierarchical level. Rather, the claim language qualifies the "initial descriptor" in terms of what it *does*—i.e., it "*links* a plurality of descriptors and two or more predecessor descriptors."

Compounding its error, Salesforce's construction departs from the explicit identification of *which elements* are linked and *what* provides the link. According to Salesforce, the "initial descriptor" is *itself* linked to a plurality of descriptors in a second level of the hierarchy. But the claim language expressly distinguishes the "initial descriptor" from the two other elements ("[1] *a plurality of descriptors* and [2] *two or more predecessor descriptors*") that the "initial descriptor" "links" together. Indeed, Salesforce's proposed construction would improperly erase at least the explicit link between the "plurality of descriptors" and the "two or more predecessor descriptors," as expressly provided by the "initial descriptor." To make matters worse, Salesforce seeks to add the extraneous requirements that the "plurality of descriptors" and the "two or more predecessor descriptors" must themselves be located "*in*" *unrecited* "second" and "third" "level[s] of the hierarchy," respectively. There is no such unambiguous *located* "*in*" requirement for the descriptors themselves, either in the claim language or the prosecution history.

14

Finally, Salesforce errors in attempting to rewrite "two or more predecessor descriptors *linking* ..." as, instead, "two or more predecessor descriptors *linked to* ...."  To be clear, under such a rewrite, the explicit perspective of "*descriptors linking*" would be erased and replaced, instead, with descriptors that are themselves *linked to* another element.  Salesforce further errs in attempting to limit the "another single initial descriptor" in terms of it being located "in" an unrecited "fourth level of the hierarchy."  As with its other extraneous alterations, Salesforce fails to defend its erroneous rewrite as *unambiguously required* by either a plain reading of the claim language or by the cited the prosecution history.

Salesforce's cherry-picked citations to the specification do not support Salesforce's fundamental rewrite.  According to Salesforce, certain example embodiments are described in the context of four hierarchal levels.  Br. 14–15.  But this does not permit Salesforce to then commit the "cardinal sin" of importing its characterization of example embodiments as claim limitations.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005).

For a myriad of reasons, therefore, it would be improper to replace the straightforward claim language with Salesforce's untethered rewrite, which is riddled with error.

## IV.    U.S. Patent No. 8,335,819 (Case No. 6:20-cv-1166-ADA)

### 1.  "scripting file" (claims 1–2, 5, 7–9, 12, 14, 16–17)

| WSOU's Position | Salesforce's Position |
|---|---|
| Plain-and-ordinary meaning. | "file written in a scripting language that is interpreted at runtime instead of being compiled into machine language instructions" |

The term "scripting file" is requires no construction apart from plain-and-ordinary meaning.  Salesforce asserts "[a] POSITA would understand that the recited 'scripting file' must be a file written in one or more scripting languages in view of the claim language and specification."  Br. 5.[8]  But Salesforce does not seek to define "scripting file" as "a file written in

---

[8] WSOU does not concede the correctness of Salesforce's characterization of the perspective of a POSITA concerning this term.  It is unclear, for example, whether Salesforce's proposed construction would encompass a text file that *contains*, though is not strictly limited to, scripting instructions (*e.g.*, as shown in Table 2 of the '819 patent).  Moreover, the specification makes clear

a scripting language."  Rather, Salesforce departs from what it alleges is the understanding of a POSITA by adding the extraneous requirements, "… that is interpreted at runtime instead of being compiled into machine language instructions."  Tellingly, Salesforce offers no defense of its additional extraneous limitations.  There simply is no lexicography or disclaimer that compels Salesforce's construction.

### 2.   "first-time request" (claims 1, 8, 16)

| WSOU's Position | Salesforce's Position |
|---|---|
| Plain-and-ordinary meaning. | "a request before a client-side persistency file has been created or a request where no previous session information exists" |

Salesforce improperly imports its construction from a non-limiting description of an example introduced as "[i]n one embodiment, …."  '819 patent, 5:6.  According to Salesforce, "[t]he patentee's use of 'i.e.' denotes it was acting as its own lexicographer."  Br. 4.  The Federal Circuit has admonished, however, that "i.e." should not be read as imposing a definitional constraint if doing so would exclude example embodiments from claim scope.  *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012).  Such is the case here.

The '819 patent generally describes Fig. 3 as providing "a flowchart of a process for providing client-side caching to a device for the first request of web content, according to one embodiment."  '819 patent, 2:60–62.  The flowchart of Fig. 3 includes a determination (at step 305) as to "whether the request (and subsequent caching) of the scripting file is a first request."  *Id.*, 8:32–34.  This example description closely resembles the claim language in question, which recites "determining whether the request is a first-time request."

The same passage further states, "[a]s described previously, for differentiation between the first request and the subsequent requests a server can identify different KeepAlive connections [using] any of several methods for identifying KeepAlive connections by a server."  *Id.*, 8:34–38.

---

that "scripting files" may contain "web session information," such as "session variables," which are not necessarily *themselves* written in a scripting language.  *See, e.g.*, '819 patent, 4:60–61, 4:66–67, 5:1, etc.

One example method involves using the "socket ID" to differentiate between first and subsequent requests. *Id*., 8:38–42. Another example method involves using "the worker process/thread ID" to differentiate. *Id*., 8:42–48.

Both the "KeepAlive connection" example and the "worker process/thread ID" example describe respective methodologies that are independent of (1) whether a client-side persistency file had previously been created or (2) whether previous session information exists. *Id*., 8:34–48. Indeed, the example methodologies described with reference to step 305 make no mention of either of the two conditions set forth in Salesforce's proposed construction. The error in applying Salesforce's alternative conditions *as necessary requirements* is further underscored by the disclosure that, *even for a first-time request*, "the client-side caching module 107 has access to the TCP socket that is used by the web server 103 and the session client 111 of the UE 101 for communication." *Id*., 8:34–38. That a first-time request may be determined even where the TCP socket has been "used" (*in past tense*) "by the web server 103 and the session client 111," reveals that certain embodiments are indifferent as to conditions expressed in Salesforce's construction.

Accordingly, the "i.e." statement quoted by Salesforce should not be read as imposing a definitional constraint here. Doing so would risk excluding example embodiments from claim scope, such as, for example, those described with reference to step 305 of Fig. 3. *Dealertrack*, 674 F.3d at 1326.

The claim language itself also counsels against interpreting the "i.e." statement Salesforce identifies as imposing a definitional constraint. Claim 1 recites that "if the request is a first[-]time request, collecting session configuration information for the web content *from the device*." Here, the phrase "the device" derives antecedent basis from "receiving a request, *from a device*, for a scripting file associated with web content, the scripting file supporting *client-side caching at the device*." The surrounding context confirms, therefore, that the session information is collected from a client-side device and hence must already exist there.

Salesforce risks precluding what the claim language expressly requires. Specifically, Salesforce's proposed construction seeks to define a "first-time request" (in part) as "a request

*where no previous session information exists*." Br. 4.  In other words, Salesforce seeks to exclude from the scope of "first-time request" any request where previous session information exists.  *Id*.  But if a "first-time request" is defined as necessarily lacking any previous session information, as Salesforce proposes, then session information cannot be collected "*from*" the client-side device for a first-time request *because no such information would exist there*.  Such an interpretation is inconsistent with the explicit requirement, "if the request is a first[-]time request, collecting session configuration information … *from the device*."  Salesforce turns this claim language on its head by incorrectly arguing that "[t]he claims' recitation of **collecting session configuration information** … if a request is a 'first time request' is consistent with Salesforce's construction that a 'first time request' is **a request where no previous session information exists**."  Br. 4.

## V.   U.S. Patent No. 8,369,827 (Case No. 6:20-cv-1167-ADA)

### 1.   "Subscriber Profile Repository (SPR)" (claims 1, 14)

| WSOU's Position | Salesforce's Position |
|---|---|
| Plain-and-ordinary meaning; the preambles of claims 1 and 14 do not recite "Subscriber Profile Repository (SPR)" as a limitation. | "a logical entity containing all subscriber/subscription related information needed for subscription-based policies and Policy and Charging Control rules as defined by the 3GPP standard" |

The phrase "Subscriber Profile Repository (SPR)" (as recited only in the *preambles* of claims 1 and 14) is not limiting and requires no construction apart from plain-and-ordinary meaning.  Salesforce fails to rebut the presumption that the *preamble* term "Subscriber Profile Repository (SPR)" is not limiting.[9]  According to Salesforce, the preambles in question "provide context to and the purpose of the claim."  Br. 7.  But words in a preamble are not limiting where they merely provide context and purpose for the invention.  *See Shoes by Firebug LLC v. Stride Rite Children's Grp.*, LLC, 962 F.3d 1362, 1367 (Fed. Cir. 2020) (citations omitted).  Thus, Salesforce's characterization of the preambles only supports the presumption and undercuts Salesforce's interpretation.

---

[9] *See* n.1, *supra*.

There likewise is no merit to Salesforce's argument that the preambles of claims 1 and 14 are limiting in their entirety ostensibly because each "provides an antecedent basis for 'unique subscriber record' and 'subscription identifiers[.]'  Br. 7.  The terms "unique subscriber record" and "subscription identifiers" are not the preamble language that Salesforce argues is limiting.  The Federal Circuit addressed similar circumstances as follows:

> Although the preamble term 'a patient' may provide antecedent basis for claim 1's later recitation of 'the patient,' that is not the preamble language Cochlear argues is limiting. A conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting."

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020).  Here, Salesforce fails to explain why "Subscriber Profile Repository (SPR)" is itself limiting where it admittedly does <u>not</u> provide antecedent basis for any limitation.

Even if the dispute had been whether the *distinct* preamble term "subscription identifiers" was limiting (and it is not), Salesforce mispresents that "subscription identifiers" provides antecedent basis for elements recited in the bodies of claims 1 and 14.  The bodies of claims 1 and 14 each introduces "at least one subscription identifier" as an element that is *independent of* anything recited in the respective preamble.  There simply is no explicit antecedent reference, in the body of either claim 1 or 14, to the term "subscription identifiers" recited in the preamble.

Because the "SPR" preamble term is not limiting, it would serve no purpose to attempt to limit its scope through the contrived and incorrect definition Salesforce advances.  Contrary to what Salesforce suggests, the '827 patent specification expressly refutes interpreting "Subscriber Profile Repository (SPR)" as slavishly requiring a specific SPR definition *verbatim*, which allegedly existed "in the 3GPP standards for LTE" at the time.  Br. 8.  No doubt Salesforce advances such an untethered interpretation solely for purposes of advancing non-infringement or invalidity positions (or both).

The Background section of the '827 patent states that 3GPP specifications existing at the time "mention a Subscriber Profile Repository (SPR)" having certain features.  '827 patent,

1:43–48.  Use of the indefinite article "a" reflects the understanding that more than one kind of SPR may exist and that the claimed inventions should be considered distinct from existing 3GPP specifications.  Further confirming this understanding, the Background section also unmistakably states 3GPP specifications existing at that time (including any definition for SPR provided therein) were deficient in several respects.  *See*, *e.g.*, *id.*, 1:52–62.  For example, among other deficiencies, prior SPR approaches are disparaged as failing to meet certain needs, such as (1) interoperability with a broader scope of network devices and messages, (2) higher efficiency than what existed at the time in resolving requests, (3) and specifying details of certain desirable features.  *Id*.

The Summary section of the '827 patent builds upon this disparagement of prior SPR approaches.  For example, at the outset, the Summary Section expresses a "present need for an SPR that is interoperable with different network devices that can quickly resolve requests."  *Id.*, 1:66–2:2.  Clearly, from the perspective of '827 patent, the referenced "present need" was not met by a specific definition for an SPR set forth in an existing 3GPP specification.

Extrinsic evidence may not be used to contradict intrinsic evidence.  *See*, *e.g.*, *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F.3d 1364, 1374–75, 77 U.S.P.Q.2d 1257 (Fed. Cir. 2005);  *Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1333 (Fed. Cir. 1998).[10]  The above *intrinsic* evidence is itself dispositive in that it refutes, on its face, the contrary opinion expressed in the *extrinsic* evidence Salesforce offers—i.e., that the SPR refenced in the preambles of claims 1 and 14 allegedly refers to a specific SPR previously *defined in a 3GPP specification*.  *See* Br. 8–9 (citing Ex. A thereto).  At a minimum, such a contrived interpretation contradicts the '827 patent's explicit disparagement of prior SPR approaches as failing to meet "*present needs*" addressed by certain claimed teachings of the '827 patent.

Accordingly,  the  Court  should  reject  Salesforce's  erroneous  construction  because (1) Salesforce failed to rebut the presumption that the preamble term in question is <u>*not*</u> limiting

---

[10] The Federal Circuit has further admonished that patent claims should preferably be interpreted without recourse to less reliable extrinsic evidence and that extrinsic evidence should, instead, be received for the purpose of educating the judge as background for the technology at issue.  *EMI Group North America, Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed. Cir. 1998).

and (2) Salesforce improperly attempts to import limitations from *extrinsic* evidence that conflict with the *intrinsic* evidence.

## VI.   U.S. Patent No. 8,391,892 (Case No. 6:20-cv-1168-ADA)

### 1.   Single dispute: whether claim 1 recites a specific order of steps

| WSOU's Position | Salesforce's Position |
|---|---|
| Claim 1 does not require a specific order for the steps Salesforce identifies. | The following steps of claim 1 must be executed in the order recited: "stor[ing]," "receiv[ing] a request," "allow[ing] or deny[ing] access," and "log[ging] the identity." |

Salesforce misinterprets claim 1 as requiring certain limitations to be performed in the order recited—namely, "store …," "receive … ," "allow or deny …," and "log ….."  The relevant portion of claim 1 is reproduced below:

> 1. A method comprising:
>
> determining, via at least one processor, to facilitate access to at least one interface configured to allow access to at least one service, the at least one service configured to perform at least the following:
>
> > store, at a server, presence information for a user;
> >
> > receive a request for access to said presence information from an entity;
>
> allow or deny access to said presence information based on a pre-defined list; [and]
>
> log the identity of an entity each time the entity requests, accesses, or is denied access to the presence information; ….

'892 patent, claim 1.

In suggesting the "store" and "receive" limitations require *performance* of respective acts *in a particular order*, Salesforce misapprehends the context in which the limitations appear.  As shown above, the words "store" and "receive" appear within the "determining" step.  The "determining" step concerns whether to "facilitate access to at least one interface configured to allow access to at least one service."  The "service" is itself expressly qualified as being *configured to perform* the "store" and "receive" limitations.  In other words, the "store" and "receive" are not recited as affirmative acts, but rather as expressly qualifying the "service" itself in terms of its *configuration*.  Salesforce's interpretation should be rejected as requiring an order of execution for limitations that are not even recited as affirmative acts.

21

Compounding its error, Salesforce argues the "allow or deny …" and "log …" limitations must also be performed in the order in which they appear.  But the "log" limitation recites an "or" conjunction that allows for "log[ing] the identify of an entity each time the entity requests … access to the presence information."  On its face, the claim language does not preclude "log[ging]" a *request* to access and doing so *before* "allow[ing] or deny[ing] access to said presence information based on a pre-defined list."  This counterexample is also fatal to Salesforce's attempt to inject an order of execution where none exists.

Salesforce has not supported its construction by its misleading characterization of the prosecution history.  Salesforce quotes remarks offered during prosecution when addressing claim language that is considerably different from what ultimately issued as claim 1.  The independent method claim pending at that time is reproduced below:

> **In the Claims**
>
> 1. (Currently amended)   A method of providing access to Presence information comprising the following steps:
>
> (a) storing Presence information for a user ~~and making that information accessible to others~~;
>
> (b) receiving a request for access to said Presence information from an entity;
>
> (c) allowing or denying access to said Presence information based on a pre-defined list;
>
> ~~(b)~~ (d) logging the identity of any entity that requests, [[or]] accesses, or is denied access to the Presence information;
>
> ~~(c)~~ (e) automatically providing data to a wireless information device operated by the user to enable that device to display the identity of the entity that requested, [[or]] accessed, or was denied access to the Presence information~~; wherein~~
>
> ~~said Presence information includes one or more of device status, current user activity and a preferred contact method of said user~~.

Ex. 892-2 to Br., at 3.  Whether a prior version of an independent method claim is correctly characterized as reciting a particular order for its steps is entirely inapposite to the issue of whether the *distinct* language recited in claim 1 *as issued* requires a particular order.

## VII.   U.S. Patent No. 8,923,899 (Case No. 6:20-cv-1169-ADA)

### 1.   "RESTful" (claims 1, 3, 6-8, 10, 13-16)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "conforming to the Representational State Transfer (REST) architectural style consisting of architectural elements and a set of constraints applied to the elements of the architecture" |

The Court need not construe "RESTful" for the following reasons.

***First***, the term "RESTful" is a term of art and should be accorded the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313. The intrinsic record makes clear that such a meaning exists. For instance, "RESTful" first appears in the Title. *See* '899 patent at Title ("Interace Between ***RESTful*** Web Services and Packet-Switched Networks for Text Messaging").  The MPEP instructs Examiners that patent titles must be "brief but technically accurate and descriptive" and instructs Examiners to require the substation of a new title that is "clearly indicative of the invention to which the claims are directed." MPEP §§606, 606.01 (8th ed. Rev. 7 July 2008) (Ex. B). The Abstract further confirms that a POSITA would have understood the term "RESTful." '899 patent at Abstract ("[s]ystems and methods are disclosed for interfacing ***RESTful*** web applications with packet-switched networks for text messaging …. The system receives a ***RESTful*** send operation for sending the MT text message from the web application. The system converts the ***RESTful*** send operation for the MT text message to a send request that is based on a signaling protocol used by the packet switched network, such as SIP, SMPP, or MAP …."). "The purpose of the abstract is to enable the United States Patent and Trademark Office and the public generally to determine quickly from a cursory inspection the nature and gist of the technical disclosure." 37 CFR §1.72. And an abstract should "sufficiently describe the disclosure to assist readers in deciding whether there is a need for consulting the full patent text for details." MPEP §608.01(b) (8th ed. Rev. 7 July 2008) (Ex. F). The fact that the Examiner allowed the '899 patent to issue with "RESTful" in the abstract demonstrates that the term had a plain and ordinary meaning to a POSITA.

Accordingly, the term "RESTful" undoubtedly has a plain and ordinary meaning. Other portions of the '899 patent use the term "RESTful" without providing definitions. *See generally* '899 patent (disclosing the term "RESTful" in the specification over sixty times); id. at Figs. Figs. 1-6). The absence of any express definition in the specification is further indicative that a POSITA would understand a plain and ordinary meaning for "RESTful." The Court need not construe this term.

**Second**, the fact that a POSITA would understand "RESTful" as a term of art is further confirmed by the prosecution history.  During prosecution, the Examiner made the following informality objection:

> Claims 1, 7 - 10 and 16-20 are objected to because of the following informalities: The claim recites the term "RESTful" which appears to be an abbreviation for the term Representational State Transfer. ***The terms are not accompanied by an explanation for the abbreviation.*** Appropriate correction is required.

Ex. C at 2.

> In response, the Applicants noted:

> The Examiner objected to the term "RESTful" in claims 1, 7-10, and 16-20. ***RESTful is a known term in the art of web services***. RESTful is ***based on*** the Representational State Transfer (REST) architecture, but ***the Applicants do not think it is necessary to somehow spell out RESTful, as it is known in the art***. Therefore, the Applicants ask the Examiner to remove this rejection.

Ex. 899-4 at 8.

In subsequent prosecution, the Examiner withdrew the objection, and the '899 patent issued without any "explanation of the abbreviation" as the Examiner initially requested. *See, e.g.*, Ex. D at 2 (indicating no pending objections). Thus, the prosecution demonstrates that the Examiner acquiesced to the Applicants statement that "RESTful" is "known in the art" and, accordingly, that it is not necessary to "spell out" the term. *See id.*

**Third**, Salesforce fails to follow the well-established tenet that extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005). Here, Salesforce relies almost exclusively on the declaration of its expert witness and a

prior art reference. Br. 45 (citing Schmidt Declaration and a Ph.D. dissertation). The only intrinsic evidence Salesforce cites constitute (a) a reference in the specification that refers to "Recreational State Transfer (REST)" and (b) a reference to Ex. 899-4, which as discussed above demonstrates that both the Examiner and Applicant deemed that no construction was necessary. As to (a), WSOU does not dispute that the terms "Recreational State Transfer" and "REST" are used interchangeably.  As to (b), even if the Applicants' statements were somehow deemed limiting (which WSOU does not concede), the Applicants merely stated that the "RESTful is *based on* the Representational State Transfer (REST) architecture." Ex. C at 2. That "RESTful" is "based on" Representational State Transfer (REST) architecture does not necessarily bind the term "RESTful" as Salesforce proposes. The need to expressly define RESTful was already addressed by the Examiner during prosecution and resolved in favor of no construction being required. The Court should do the same here.

### 2. "Session Initiation Protocol (SIP) request" / "SIP request" (claims 1-2, 6-9, 13-16)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "a message conforming to the request message format of the Session Initiation Protocol specification as set forth in RFC 3261 published by the Internet Engineering Task Force" |

The Court need not construe "Session Initiation Protocol (SIP) request" or "SIP request."

*First*, as a threshold matter, while WSOU does not agree to Salesforce's construction, the parties do not dispute that "Session Initiation Protocol (SIP) request" and "SIP request" refer to the same thing. *See* Br. 44. This comports with the plain language of the claim, which recites "SIP" in parenthetical after "Session Initiation Protocol." No express construction is necessary because the claim language vis-à-vis the parenthetical makes this relationship clear.

*Second*, Salesforce fails to point to any of the two *Thorner* exceptions to plain meaning— *i.e.*, lexicography or disavowal. *See* Br. 44. With respect to lexicography, Salesforce essentially

concedes that none exist by admitting that "the term 'SIP request' does not appear in the specification." *Id.*

**Third**, as with the term "RESTful" above, Salesforce violates the basic patent law tenet that extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered ***in the context of the intrinsic evidence***." *Phillips*, 415 F.3d at 1319. Here, Salesforce relies almost exclusively on the declaration of its witness. Br. 44 (citing Paragraphs 117-18 of Schmidt Declaration). The only intrinsic evidence Salesforce cites constitutes references in the specification that equate "SIP" refers to "Session Initiation Protocol." *See id.*. As noted above, equating those terms is evident from the claim language itself and is undisputed between the parties. The Schmidt Declaration suffers from the same flaw and is similarly untethered to the "context of intrinsic evidence. *Phillips*, 415 F.3d at 1319.

**Fourth**, Salesforce errs by arguing that attempts to equate the term "SIP MESSAGE" in the specification to the claim term "Session Initiation Protocol (SIP) request." Br. 44 (citing Schmidt Declaration, ¶¶ 117-18). Salesforce ignores dependent claim 2, which depends on claim independent claim 1, and recites that "first SIP request comprises a SIP MESSAGE." By further requiring that the "first SIP request" comprise a "SIP MESSAGE," the claim language indicates that they are not one in the same. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) (citing 35 U.S.C. § 112 ¶ 4) ("It is axiomatic that a dependent claim cannot be broader than the claim from which it depends...A dependent claim narrows the claim from which it depends.").

## VIII.   U.S. Patent No. 9,088,493 (Case No. 6:20-cv-1170-ADA)

### 1.   "login of the user with one of the one or more online services" (claims 1,5)

| WSOU's Position | Salesforce's Position |
|---|---|
| Plain-and-ordinary meaning | "an entering of user information in order to access an online service" |

The phrase "login of the user with one of the one or more online services" (as recited in claims 1 and 5) requires no construction apart from plain-and-ordinary meaning.  Salesforce errs in proposing to rewrite the disputed phrase as "an entering of user information in order to access an online service."  Salesforce's construction cuts from whole cloth extraneous limitations apparently directed to *how* and *why* the login is effected.  The claim language is agnostic on both points.  Compounding its error, Salesforce proposes using the indefinite article "an" to introduce the extraneous term "an online service."  This would further depart from the claim language, which uses the definite article "the" in making antecedent reference to "the one or more online services."

It remains undisputed that the '493 patent specification contains no lexicography or disclaimer that expressly restricts "login of the user with one or more online services" to "an entering of user information in order to access an online service."  Salesforce's contrived definition does not appear anywhere in the intrinsic evidence.  Indeed, Salesforce's partial quotations from the patent specification do not even make explicit reference to the word "login."  Br. 17 (quoting '493 patent at 7:20–22, 32–35).  The example descriptions in the specification that actually include the word "login" do not express any need whatsoever for a user to enter any information in order to gain access to online services.  *See, e.g.*, '493 patent, 4:1–9.

It is unclear why Salesforce points to disclosure in the specification addressing example embodiments for *recording* login *times*.  Br. 17.  The cited passages do not support the construction Salesforce seeks.  Claim 1 recites the disputed phrase in the context of "collecting timing information relating to usage by the user from a platform configured to provide the one or more online services, wherein the timing information is associated with *a login of the user with one of the one or more online service*."  Claim 5 recites similar language in the context of an apparatus.  Salesforce's proposed rewrite of the *disputed* term is not supported by disclosed examples reflecting the *distinct* and *undisputed* requirement of "[collecting/collect] timing information."  It is likewise unavailing to Salesforce that the claim language qualifies the "timing information" as being "associated with a login of the user."  This surrounding context speaks for itself and does

27

not support restricting "login" as necessarily requiring the extraneous limitations Salesforce (yet again) pulls from thin air.

Salesforce also appears to take the position that the claimed "login" must take place *after* an *unrecited* registration. Br. 17. Because this specific sequence of events is extraneous to both the claim language itself and to the erroneous construction Salesforce proposes, Salesforce's tacit and belated attempt to inject a distinct dispute over an unclaimed sequence is of no moment.

### 2. "[determining / determine] … a pattern of consistent usage from the timing information" (claims 1,5)

| WSOU's Position | Salesforce's Position |
| --- | --- |
| Plain-and-ordinary meaning | Indefinite, or, in the alternative, "determining, based on applying a set of predefined rules to the timing information, that the user's usage of an online service is free from variation to a certain degree for a certain time window" |

### 3. "a consistency of the determined pattern of consistent usage" (claims 1,5)

| WSOU's Position | Salesforce's Position |
| --- | --- |
| Plain-and-ordinary meaning | Indefinite, or, in the alternative, "the extent to which the previously determined pattern of consistent usage is within a certain tolerance range or time window based on the predefined rules applied to the timing information" |

The above two disputed phrases presumptively satisfy the definiteness requirement under 35 U.S.C. § 112. This presumption can only be overcome by clear and convincing evidence. Salesforce comes nowhere close to meeting this exacting standard.

In purporting to challenge the presumed definiteness of the "[determining/ determine] …" phrase (dispute no. 2), Salesforce complains that "'pattern of consistent usage' does not have a well understood meaning to one of skill in the art." Br. 18. Salesforce overlooks, however, that claims 1 and 5 both expressly qualify the claimed "pattern of consistent usage" as follows: "wherein *the pattern* reflects usage of at least one of the one or more online services and transmission availability of a message." This explicit "wherein" clause, when understood in light of the remainder of the specification, would enable a person of ordinary skill in the art to discern,

28

with reasonable certainty, the plain meaning of the recited "pattern of consistent usage."  It is telling that Salesforce and its declarant ignore the qualifying "wherein" clause altogether.

In purporting to challenge the presumed definiteness of the "… consistency …" phrase (dispute no. 3), Salesforce gripes that the neither the claims nor the specification provide sufficient clarity as to "what 'consistent' or 'consistency' means."  Br. 19.  Salesforce is wrong.  Claims 1 and 5 both qualify "[generating/generate] scheduling information …" (in part) as being "based on the determined pattern of consistent usage and a consistency of the determined pattern of consistent usage."  The phrase "***the*** determined pattern of consistent usage" derives antecedent basis from the "[determining/determine] …" in which the phrase "pattern of consistent usage" is expressly qualified, as explained above.

A person of ordinary skill in the art would likewise understand the phrase "a consistency of the determined pattern of consistent usage" with reasonable certainty, particularly in view of the ample corresponding disclosure in the remainder of the specification.  For example, the specification describes an embodiment involving "consistency rules" based on the following mathematical expression: "the amount of variation in timing information over a certain period of time."  '493 patent, 4:48–50.  This counterexample refutes Salesforce's incorrect assertion that "the only disclosures in the specification . . . involve terms of degree."  Br. 19.  Here, the example mathematical expression returns a value for consistency as "the amount of variation in timing information over a certain period of time," *whatever the amount or time period may be*.  Nothing in the claim language prohibits the "generating" of claim 1, or the "generate" of claim 5, from being "based on … a consistency of the determined pattern of consistent usage," where the "consistency" is *itself* based on "the amount of variation in timing information over a certain period of time" (as disclosed in the quoted example).  *Id*.

In the alternative to its woefully deficient indefiniteness theories, Salesforce proposes constructions that impermissibly restrict claim scope in a manner that would exclude preferred embodiments.  It is ironic that Salesforce incorrectly characterizes the disputed phrases as expressing terms of degree, only to then propose *adding unrecited* terms of degree under the guise

29

of claim construction.  For the claim language of dispute no. 2, for example, Salesforce seeks to add the extraneous requirement, "determining … that the user's usage of an online service is *free from variation to a certain degree* for a certain time window."  Similarly, for claim language of dispute no. 3, Salesforce seeks to add the extraneous requirement, "the extent to which the previously determined pattern of consistent usage *is within a certain tolerance range* or time window."  At a minimum, Salesforce's improper addition of *extraneous* limitations of degree would risk excluding certain preferred embodiments, such as those discussed above, in which "consistency" is optionally calculated based on "the amount of variation in timing information over a certain period of time." '493 patent, 4:48–50.

## IX.    U.S. Patent No. 9,277,060 (Case No. 6:20-cv-1171-ADA)

### 1.    "event" (claims 1, 5, 8, 9, 11, 17, 18, 21)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "communication associated with an identifier" |

The Court should reject Salesforce's construction for the following reasons.

**First**, Salesforce fails to point to any of the two *Thorner* exceptions to plain meaning— *i.e.*, lexicography or disavowal. *See* Br. 26-27. At most, Salesforce merely points to intrinsic evidence that is—according to Salesforce—"reflective," "consistent with," or "further confirms" its proposed construction. *See id.*

**Second**, Salesforce improperly relies on general statements in the intrinsic record without linking them to the disputed term at issue—"event." For instance, Salesforce relies on the "entire context of the '060 patent" including portions of the Field of the Invention and Background of the Invention sections. Br. 27. But Salesforce merely points to recitations of "communications" and "historic communications data" and fails to link those statements to "event" in the claims. As noted above, the "standard for disavowal" is "***exacting***" and requiring that the specification "makes clear that the invention does not include a ***particular feature***." *Thorner*, 669 F.3d at 1366 (quotations omitted). Here, Salesforce fails to meet this "exacting" standard when the portions of the specification it cites fail to refer to "event."

30

*Third*, Salesforce is wrong to conclude that the surrounding claim language of claims 1 and 17 "confirms that 'events' are specifically tied to communications." Br. 27. Salesforce's arguments boils down to the mere (and unremarkable fact) that both "events" and "communications" are referenced in the same independent claims. For instance, claim 1 is reproduced below with the word "communication" in blue highlighting and "event" in yellow highlighting:

> 1. A method comprising:
>
> receiving, at a communication device, an incoming telephone call, which a user
>     can choose to answer or leave unanswered;
>
> accessing one or more logs that associate data with identifiers to obtain log data
>     associated with an identifier included in the incoming telephone call;
>
> creating a user alert for the incoming telephone call that includes displaying,
>     while receiving the incoming telephone call at the communication device,
>     event information based on the obtained log data that informs the user of
>     at least a first user preferred last event associated with the included
>     identifier, wherein said first user preferred last event is associated with an
>     event type, wherein said event type is associated with a user assigned level
>     in a hierarchy of importance, wherein the displayed information includes
>     a listing by event type of at least the first user preferred last event and a
>     second user preferred last event associated with the included identifier,
>     and wherein the display of said listing is ordered based on said hierarchy
>     of importance; and
>
> updating, automatically without user input, by a processor of the communication
>     device the data associated with the included identifier in one or more logs.

'060 patent at 7:14-37.

Contrary to Salesforce's assertion, the mere fact that incoming telephone calls are "receiv[ed] at a communication device" does not necessarily make all "events" one and the same with "communications." The claims are limited by the word "communication" but only to the extent such recitations exist in the claims. There is no "specific[] tie" between the two concepts as Salesforce claims.

*Fourth*, Salesforce is also wrong by arguing that the specification supports its construction. Most notably, the specification refers to non-communication events such as an "appointment in a calendar." '060 patent at 4:9. That the term "event" includes both communication and non-communication events is further confirmed by the use of the word "event" and "communication." For instance, the specification describes an "[a]n alert message 46 may, for example, reference the *last communication* that is associated with the extracted identifier *irrespective of the event, i.e.* phone call, message, email or appointment." *Id.* at 6:11-14. If a "communication" can be "irrespective of an event," they cannot be inextricably tied together as Salesforce claims.

*Fifth*, Salesforce provides no explanation for its claim that the plain and ordinary meaning would lead to "jury confusion in view of the conventional understanding of the term 'event.'" Br. 26. Salesforce has failed to articulate what it means by "conventional meaning," what that conventional meaning might be, and why it would be confusing to a jury. In any event, claim terms should be accorded the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips*, 415 F.3d at 1313.

### 2.  "log(s)" (claims 1, 2, 3, 11, 17, 21)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "a logically or physically separate data store that provides a history of prior communications and attempted communications of a single event type and is automatically updated without user input" |

Salesforce is wrong to assert that the Applicants acted as lexicographers.

*First*, the portion of the specification relied on by Salesforce for purported lexicography (3:3-7) is expressly limited to not only "EMBODIMENTS" but also an "example illustrated." '060 patent at 2:48; 2:65. Indeed, Salesforce misquotes the specification by omitting the reference numeral "24" after the word "logs." Br. 28. This omission is telling because the Applicants are conveying that only the "log 24" (illustrated in Fig. 1) of the embodiment is being disclosed. The Applicants further signaled that the embodiments are in no way limiting by expressly stating that "[a]lthough *embodiments* of the present invention have been described in the preceding paragraphs

with reference to *various examples*, it should be appreciated that modifications to the examples given can be made without departing from the scope of the invention *as claimed*."

*Second*, there was no disavowal of claim scope as Salesforce alleges. See Br. 29. The claim language recites "updating, automatically without user input, by a processor of the communication device the data associated with the included identifier in one or more logs." *See* e.g., claim 1. The express claim language specifies that the "updating" occur "by a processor of the communication device" and that the thing being updated is the "data associated with the included identifier in one or more logs." While the express claim language applies the "updating" to the "data associated with the included identifier in one or more logs," Salesforce's construction would apply the "updating" to the log itself.  There is no support for that construction in view of the plain language of the claim. Moreover, the express claim language "automatically without user input" was added by amendment, but there is no disavowal of claim scope other than the words of the amended language itself. While Salesforce claims there was a "clear disavowal of claim scope," it fails to explain what that disavowed claim scope might be or how it would be different than the express language of the claim. The "standard for disavowal" is "*exacting*" and requiring that the specification "makes clear that the invention does not include a *particular feature*." *Thorner*, 669 F.3d at 1366 (quotations omitted). Here, Salesforce fails to meet this "exacting" standard when it fails to identify the "particular feature" that the invention no longer includes.

## X.      U.S. Patent No. 9,336,320 (Case No. 6:20-cv-1172-ADA)

### 1.      "the menu items are associated with the two or more different services" (claims 1,10)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "the menu items are ==each== associated with ==at least== two different services" |

Salesforce's construction should be rejected for the following reasons.

*First*, Salesforce's construction is improper because it does seek to *define* the above phrase or a word within the above the phrase; rather, Huawei attempts interject the phrases "each" and

"at least" when the claim is silent. *See K-2*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments*, 988 F.2d at 1171 ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth."). Salesforce's supposed support in the claim language merely refers to recitations of the disputed phrase itself and the mere fact that the word "services" (plural) is made in reference to "at least one menu item." Br. 40-41. Salesforce misreads the claim language. Except for the article "the," the disputed phrase at issue is repeated throughout claim 1 (as an example) as shown below:

> A method comprising:
>
>> receiving location information associated with a device;
>>
>> selecting, via a processor, ==menu items associated with two or more different services== based on the location information;
>>
>> causing, at least in part, presentation, via the processor, of the selected menu items in a bridge, wherein the bridge is a user interface element common to the two or more different services; and
>>
>> determining a language based on the location information,
>>
>> wherein the selected menu items are presented in the determined language,
>>
>> wherein the ==menu items are associated with the two or more different services== that are available to the device based on the location information, and
>>
>> wherein at least one ==menu item associated with the two or more different services== is presented in a manner indicating that the at least one menu item is unavailable to the device at the location indicated by the location information associated with the device.

The use of the phrase "services" in the last "wherein" clause above is merely a result of the consistent usage of that highlighted language in the claim. This does not express or support the limitations Salesforce seeks to add.

**Second**, Salesforce's attempt to rely on the specification is based on flawed logic. Namely, Salesforce points to what it admits are "examples" in the specification where the content could be limited based on country. *See* Br. 41 (citing '320 patent at 4:54-65). Salesforce then partially quotes the following portion of the specification (with the yellow highlighted term omitted):

> When the user is presented the bridge and menu items on the web page, the user can provide input to the UE 101 to select one of the menu items in the bridge. As the user selects the menu item, additional menu items or sub-menu items may be presented to the user for selection. ***Some selected*** menu items may be utilized to cause initiation of one of the services corresponding to the menu item.

'320 patent at 4:66-5:6.

By omitting the phrase "[s]ome selected" from its Brief, Salesforce hopes to leave the impression that "each" menu item is necessarily associated with "at least two" different services. Br. 41. But when reading this passage with the language that Salesforce omits, it is clear that only "some selected" menu items (not "each") "may be utilized to cause initiation of one of the services corresponding to the menu item." '320 patent at 4:66-5:6. Moreover, even if the phrase "[s]ome selected" was absent from the specification, at most Salesforce only establishes that some menu items in "examples" that have multiple services corresponding to that item. It does not—as Salesforce contends—provide any support that "each" menu item is limited, especially when only "examples" are being discussed in the specification.

***Third***, the Applicants did not—as Salesforce claims—"expressly define" this term during prosecution. Br. at 41-42. Salesforce's presentation of its facts is confusing because it (i) omits relevant context and (ii) miscites and/or fails to cite to its Exhibit numbers.[11] WSOU restates the facts that Salesforce attempts to describe below. To aid the Court, WSOU has restated the portions of the prosecution history that Salesforce has attempted to describe:

In a "Response Under 37 C.F.R. §1.111" filed on January 14, 2013, the Applicants amended the claims, including the following amendment to claim 1:

---

[11] For instance, the Stake Declaration states that Exhibit 320-4 is an "excerpt" of the Original Application. Stake Decl. ¶46. In its Brief, though, Salesforce uses "320-4" to refer to "the "2013-03-25 Response After Final Action." Br. at 46. That Response, however, is attached as Exhibit 320-7. After misciting to "320-4," Salesforce then uses an "id." citation to reference two different documents—"2013-01-14 Amendment/Request for Reconsideration After Non-Final Rejection" and the "2013-03-25 Response After Final Action." According to the Stake Declaration, those two documents are Exhibits 320-5 and 320-7, respectively. Finally, the Brief refers to the "Decision on Appeal" as Exhibit 320-1. Br. at 46. According to the Stake Declaration, the Appeal Decision is Exhibit 320-9. The Stake Declaration also erroneously refers to Exhibit 320-6 as an "excerpt of the January 25, 2013 Response to Office Action." Exhibit 320-6 appears to be an Office Action (not a response to an office action).

> wherein the menu items are associated with the two or more <u>different</u> services that are available to the device based on the location ~~information, and~~ <u>information,</u> ~~the services include music services, video services, picture services, news services, social networking services, purchase related services, electronic mail services, calendar services, and file management services~~
>
> <u>wherein at least one menu item associated with the two or more different services is presented in a manner indicating that the at least one menu item is unavailable to the device at the location indicated by the location information associated with the device.</u>

Ex. 320-5 at 3.

In an Office Action of Jan. 25, 2013, the Examiner made objections, which paralleled the structure of the two "wherein" clauses recited above:

> "the menu items are associated with the two or more different services that are available to the device based on the location information" *Jheng p.2 [0024]; in said paragraph, "all menu items of a service menu" and "storage device 140 store ... service information 144, location information 146 and association network information 148" are disclosed;*
>
> "at least one menu item associated with the two or more different services is presented in a manner indicating that the at least one menu item is unavailable to the device at the location indicated by the location information associated with the device" *Jheng p.1 [0008]; in said paragraph, "the menu item of a service menu is disabled or the menu item is removed from the service menu when the queried status indicates that the service is unavailable, preventing a user from requesting the service via the menu item" is disclosed; the "disablement" of a menu item is an indication of the unavailability of such an item.*

Ex. 320-6 at 6.  Notably, the language of the first paragraph above tracks the language of the first "wherein" clause, and the language of the second paragraph above tracks the language of the second "wherein" clause.

In a Response Under 37 C.F.R. §1.116 filed on March 25, 2013, the Applicants argued that the second "wherein" clause was lacking in the prior art. It is these arguments (directed to the second "wherein" clause) that Salesforce relies upon. Br. 41-42. The arguments are reproduced below with yellow highlighting tracking the language of the second "wherein" clause:

> Applicants respectfully disagree with the Final Office Action's assertions. As seemingly acknowledged by the Final Office Action, the primary reference to Logan et al. does not describe at least one menu item associated with two or more different services. In addition, and contrary to the Final Office Action's assertions Jheng does not remedy the above deficiencies of Logan et al.
>
> Further, neither of the applied references disclose or even suggest, wherein at least one menu item associated with the two or more different services is presented in a manner indicating that the at least one menu item is unavailable to the device at the location indicated by the location information associated with the device.

Ex. 320-7 at 8-9.

Salesforce disingenuously suggests that the arguments above were a "characterization of this term," with "this" referring to the term in dispute here. Br. 42. But as noted above, the arguments the Applicants made in yellow highlighting above merely quoted the verbatim language of the second "wherein" clause, which is not in dispute here. The claim term that is in dispute is the first "wherein" clause. At most, Salesforce's arguments have established that the express language of the second "wherein" clause is limiting *to that clause*. It does not have any bearing and is certainly not a characterization of the first "wherein" clause—*i.e.*, the clause that is in dispute here. The "standard for disavowal" is "***exacting***" and requiring that the specification "makes clear that the invention does not include a ***particular feature***." *Thorner*, 669 F.3d at 1366 (quotations omitted). Here, Salesforce fails to meet this "exacting" standard when it attempts to apply arguments made with respect to a different clause that is not in dispute.

### 2. "presented in a manner indicating that the at least one menu item is unavailable" (claims 1, 10)

| WSOU's Position | Salesforces' Position |
|---|---|
| Plain-and-ordinary meaning | "graphically depicting a previously selectable menu item that cannot be selected; removing the menu item is not graphically depicting" |

Salesforce's construction of this term suffers from multiple flaws.

***First***, the claim language does not support Salesforce's rewrite.  There is no reference in the claims to "graphically depicting a previously selectable" or the carve-out that Salesforce attempts to interject—i.e., "removing the menu item is not graphically depicting." Nor is there any reference in the claims that would justify replacing the claim language "is unavailable" with Salesforce's proposed language of "that cannot be selected." Salesforce's ***only*** basis to interject these phrases into the claim language is its reliance on the construction of the term "simultaneously presented" recited in a different patent, in a different case, and involving different technology. Br. 37 (citing *Meade Instruments Corp. v. Yamcon, Inc.*, 197 F. App'x  929, 932 (Fed. Cir. 2006)). But a particular term, even the same term, "need not have the same meaning when used in an entirely separate patent, particularly one involving different technology." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005).[12] In *Meade*, the patent related to a "handheld device for locating and identifying celestial objects that are visible to the naked eye" and entirely different technology than that at issue here. The Federal Circuit also made clear that its construction turned on the surrounding claim language. *Meade*, 197 Fed. Appx. At 932 ("[e]specially when followed by the preposition 'to,' the verb 'present' (or 'provide,' in the case of claim 15) suggests the act of making something immediately accessible for the user to view.").

***Second***, Salesforce is wrong to assert that the specification "directly equates, in a definitional manner" this term and the description of "ghosting." Br. 38 (quoting '320 patent at 10:52-57). But Salesforce omits the recitation of "in some embodiments." *See id.*  The full recitation of the specification is reproduced below:

---

[12] *Accord Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 42 (Fed. Cir. 2020) ("our construction of different claims in different patents is insufficient to overcome the plain language of the claims and the specification here"); *MEMC Elec. Materials v. Mitsubishi Materials Silicon Corp.*, C 01-4925 SBA, 2004 WL 5363616, at *3 (N.D. Cal. Mar. 2, 2004) ("Claim construction depends on the examination of intrinsic and extrinsic evidence. Even if the claim language in the two patents is "basically" the same, it is reasonable to assume that in light of the totality of the evidence presented during a proper claim construction hearing, this Court may construe similar terms found in different patents differently."), *aff'd sub nom. MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005).

> *Further, in some embodiments*, the menu structure *may show* all of the installed services on the UE 101 during presentation of the menu items on the bridge, but ghost unavailable menu items and services. In this embodiment, ghosting is presenting a menu item to show that the menu item is associated with the UE 101 (e.g., installed), but unavailable (e.g., non-selectable).

'320 patent at 10:51-57.

The recitation of "some embodiments" is important because it tells a POSITA that not all embodiments include the ghosting as described in the context in "some" (but not all) of the embodiments. The portion of the specification upon which Salesforce relies thus refutes its own position that all "presented in a manner indicating that the at least one menu item is unavailable" is limited to ghosting. Rather, their claims recite a broad concept ("presented in a manner indicating that the at least one menu item is unavailable"), and ghosting is just one of the ways this is performed in "some" but not all embodiments. The fact that ghosting is not part of this term is further supported by the phrase "menu structure *may* show." *See id.* The permissive use of the word "may" indicates that not all embodiments needed to include ghosting as Salesforce argues. In its remaining arguments, Salesforce attempts to interject the extrinsic dictionary definitions of "ghosting." Br. 38. As noted above, the claims are not limited to "ghosting." "Ghosting" is not recited in the claims or equated to the term at issue.  Thus, in addition to improperly relying on extrinsic evidence, the dictionary definitions have no bearing on the meaning of the disputed term.

*Third*, Salesforce improperly attempts to invoke prosecution disclaimer by misreading the file history.[13] According to Salesforce, the "Applicant[s] expressly disavowed any claim scope

---

[13] In addition to substantive errors, Salesforce's Brief makes citation errors when referring to the prosecution history. For instance, Salesforce refers to "*See id.*" to refer to the Original Application Specification, where the previous citation is to a case. *See* Br. 39. According to the Stake Declaration, the proper citation should be Exhibit 320-4. Stake Decl., ¶46. Salesforce then refers to "Ex. 320-4, 2013-01-14 Amendment/Request for Reconsideration After Non-Final Rejection." *See* Br. 39. Stake cites the amendment as Exhibit 320-5. Stake Decl., ¶47. After that citation, Salesforce's Brief refers to an "Id., 2013-01-25 Final Rejection." The only document with that date in the Stake Declaration is the Office Action of Jan. 25, 2013, which is labeled "Exhibit 320-6." The Stake Declaration erroneously refers to this document as "Response to Office Action." Stake Decl., ¶48. The cited document is in fact an Office Action, not a response. WSOU refers to the Exhibits as labeled, not as erroneously cited in Salesforce Brief and/or (in certain instances) the Stake Declaration.

that would rely on removal of a menu item as graphically depicting that the item cannot be selected." Br. 39. Salesforce bases this assertion on the March 25, 2013 response. The relevant statements by the Applicant, upon which Salesforce relies, are reproduced below to show their full context:

> Further, neither of the applied references disclose or even suggest, wherein **at least one menu** item **associated with** the two or more **different services is presented** in a manner indicating that the at least one menu item is **unavailable to the device at the location indicated by the location information** associated with the device. The Final Office Action, again seemingly acknowledges that the primary reference to *Logan et al.* fails to disclose such features and relies on paragraph [0008] of *Jheng* for allegedly teaching such features. However, the Final Office Action's reliance on *Jheng*, as well as the assertions of the Final Office Action are simply misguided. Paragraph [0008] of *Jheng*, in pertinent part, discloses (emphasis added):
>
>> [0008] An embodiment of the invention also provides a method for altering MMI configurations for use in a device. The method comprises the following steps. A status of a service is queried after detecting that an inspection condition is satisfied. The queried status is acquired from the currently associated network. <u>A menu item of a service menu is enabled when the queried status indicates that the service is available</u>. Otherwise, <u>the menu item of the service menu is disabled or the menu item is removed from the service menu when the queried status indicates that the service is unavailable, preventing a user from requesting the service via the menu item.</u>
>
> Paragraph [0008] of *Jheng*, at best, merely teaches that a menu item of a service menu is enabled when the queried status indicates that the service is available, and that the menu item of the service menu is <u>disabled or the menu item is removed from the service menu when the queried status indicates that the service is unavailable</u>. However, paragraph [0008] of *Jheng*, much less the entire disclosure, does not explicitly teach that menu item of *Jheng* is (1) associated with two or more **different services**, and (2) is **presented in a manner indicating that the menu item of *Jheng* is unavailable to a device of *Jheng* at a location indicated by location information associated with the device**.

Ex. 320-7 at 9.

As noted above, Applicants made note that Jheng lacked two teachings (denoted by yellow and blue highlighting above). With respect to the blue highlighted portion, it is clear that the Applicants are contrasting mere unavailability as described in Jheng and that Jheng lacks any teaching of "presented in a manner indicating that the menu item of Jheng is unavailable to a device of Jheng at *a location indicated by location information associated with the device*." It is the lack of teaching of any unavailability based on "location indicated by location information" that is being emphasized by the Applicants. Salesforce misreads the prosecution history by not reading the full context.   Accordingly, the Applicants did not disavow any claim scope. They merely recited the claim language "location indicated by location information associated with the device" that was already present in the pending claims.

Dated: November 3, 2021                    Respectfully submitted,

                          By:    */s/ Ryan S. Loveless*
                                 James L. Etheridge
                                 Texas Bar No. 24059147
                                 Ryan S. Loveless
                                 Texas Bar No. 24036997
                                 Brett A. Mangrum
                                 Texas Bar No. 24065671
                                 Travis L. Richins
                                 Texas Bar No. 24061296
                                 Jeff Huang
                                 Etheridge Law Group, PLLC
                                 2600 E. Southlake Blvd., Suite 120 / 324
                                 Southlake, TX 76092
                                 Tel.: (817) 470-7249
                                 Fax: (817) 887-5950
                                 Jim@EtheridgeLaw.com
                                 Ryan@EtheridgeLaw.com
                                 Brett@EtheridgeLaw.com
                                 Travis@EtheridgeLaw.com
                                 JHuang@EtheridgeLaw.com
                                 Brian@EtheridgeLaw.com

41

Mark D. Siegmund
State Bar No. 24117055
mark@swclaw.com
STECKLER WAYNE COCHRAN CHERRY,
PLLC
8416 Old McGregor Rd.
Waco, Texas 76712
Telephone: (254) 651-3690
Facsimile: (254) 651-3689
*Counsel for Plaintiff WSOU Investments, LLC*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on November 3, 2021.

*/s/ Ryan S. Loveless*
Ryan S. Loveless